IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

Fresno Division

| | |
|---|---|
| Clarence Howard,<br><br>    Plaintiff,<br><br>vs.<br><br>C/O J. Nunley, et al.,<br><br>    Defendants. | No. CV-06-00191-NVW<br><br>**ORDER** |

Before the Court is Defendants' motion for summary judgment (Doc. 60). The Court has reviewed the parties' briefs and exhibits, as well as Plaintiff's deposition (*See* Doc. 62). The Court will grant the motion and terminate this case.

**I.     Standard**

Summary judgment is warranted if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the nonmoving party would bear the burden of persuasion at trial, the moving party may carry its initial burden of

1 production by producing "evidence negating an essential element of the nonmoving party's
2 case," or by showing, "after suitable discovery," that the "nonmoving party does not have
3 enough evidence of an essential element of its claim or defense to carry its ultimate burden
4 of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099,
5 1105–06 (9th Cir. 2000).

6 When the moving party has carried its burden, the nonmoving party must respond
7 with "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The
8 nonmoving party "may not rely merely on allegations or denials in its own pleading." *Id.*
9 Allegedly disputed facts must be material—the existence of only "*some* alleged factual
10 dispute between the parties will not defeat an otherwise properly supported motion for
11 summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)
12 (emphasis in original).

13 Where the record, taken as a whole, could not lead a rational trier of fact to find for
14 the nonmoving party, there is no genuine issue of material fact for trial. *Matsushita Elec.*
15 *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, the nonmoving party's
16 properly presented evidence is presumed to be true and all inferences from the evidence are
17 drawn in the light most favorable to that party. *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d
18 1285, 1289 (9th Cir. 1987).

19 **II.    Facts**
20       **A.    Inmate Howard's Excessive Force Claim Against Officer Nunley**
21            **1.    Howard's Version of Events**

22 Plaintiff Clarence Howard is an inmate at the California Correctional Institute (CCI)
23 in Tulare, California. When the events leading to this lawsuit transpired, Howard lived in a
24 cell by himself. The door to his cell contained a food port through which prison officers
25 could deliver his meals without opening the whole door.

26 On March 2, 2004, Howard — a vegetarian — received his evening meal through the
27 food port from Defendant Jeremy Nunley, a corrections officer at CCI. Howard claims that
28 Nunley had previously harassed him verbally about his food preferences. After Nunley had

given Howard his food tray on this particular evening, Howard noticed that his meal contained no bread. Howard needs a certain amount of nutrients every day, and so the lack of bread concerned him. Howard knocked on his cell door to get Nunley's attention. Nunley returned and Howard pointed out the absence of bread. Nunley responded that there had been bread on Howard's tray. Howard protested again that he had received no bread, but Nunley threatened that if Howard knocked on his cell door again, Nunley would pepper spray him. Nunley then walked away.

Through his cell door window, Howard soon spotted another corrections officer on the lower tier of Howard's cellblock. Howard knocked on his cell door and called out to the officer to get his attention, intending to ask the officer for help in getting bread. Before that officer could respond, Nunley came running back. Nunley opened the food port and began discharging pepper spray into Howard's cell. Howard retreated to the back of his cell, placed a towel over his food tray, and then waited until Nunley finished spraying, less than a minute later. Nunley then looked through Howard's cell door window, noticed that Howard remained unmoved at the back of his cell, opened the food port again, and discharged the remaining contents of his pepper spray canister. Nunley could apparently tell that Howard's eyes were burning at this point because he then said to Howard, "Nigger, we got you. Come on out of your cell."

After this incident, other corrections officers arrived and took Howard to a shower. Howard's eyes continued to burn for some time after the shower, but he suffers no lasting effects from the pepper spray.

### 2. Nunley's Version of Events

Nunley admits that he served Howard's evening meal on March 2, 2004, and that Howard complained of not receiving bread. Nunley explained to Howard that he had received bread because Nunley had seen bread on Howard's tray. Howard then began to curse and kick his cell door. Nunley ordered him to stop kicking the door. Howard complied, but continued yelling and cursing. Nunley then began to walk away, at which point Howard

resumed kicking the door. Nunley again ordered Howard to stop kicking, at which point Howard cursed at Nunley and continued kicking.

Another corrections officer (not a party to this action) then assisted Nunley by opening Howard's food port, through which Nunley began discharging his MK-9 pepper spray "fogger" into Howard's cell. Howard shielded himself from the pepper spray with a towel, grabbed Nunley's right wrist, and pulled Nunley's arm through the food port into the cell. Fearing that Howard would break his arm, Nunley dispersed his remaining pepper spray directly into Howard's face. Howard then gave up his resistance. Nunley and other officers escorted Howard to the shower, after which Nunley went to a prison medical clinic to be evaluated for minor injuries to his right arm. Nunley had nothing more to do with Howard after that.

### B. Inmate Howard's Eight Amendment Unconstitutional Conditions Claim Against Warden Sullivan

Following Howard's shower, prison officials placed him in a temporary holding cell, and eventually instructed him to remove all of his clothes. They then moved him to what Howard calls a "strip cell." A strip cell — which Defendants' summary judgment papers refer to as "management status" — is apparently a bare room, or at least bare of any bedding. According to Howard, inmates enter the cell naked and gradually receive clothing, one article at a time, over the space of three days. Over those three days, the inmate sleeps on the floor. Then, after receiving a full set of clothing, the inmate gradually receives bedding, beginning with a mattress, a blanket, and then a sheet.

Howard received his clothing on schedule, but did not begin to receive bedding until after four days, rather than three. Sleeping on the floor during those four days gave Howard back pains and a cold. Howard was eventually moved back to a traditional cell. The record is not clear whether Howard continues to suffer medical problems from the strip cell.

Howard blames CCI's warden, Defendant William Sullivan, for his discomfort while in the strip cell, and also vaguely claims that the strip cell is *per se* unconstitutional. Neither Sullivan nor any member of the prison staff has submitted evidence about Howard's

1  conditions of confinement in the strip cell. The Court will therefore treat Howard's testimony
2  about those conditions as undisputed. Howard, however, has presented no evidence that he
3  exhausted administrative remedies against Sullivan, nor that Sullivan knew anything about
4  him or his experience in the strip cell.

5  **III.    Analysis**

6      **A.    Howard's Excessive Force Claim Against Nunley**

7  Use of excessive force on prisoners violates their Eighth Amendment right to be free
8  from cruel and unusual punishment. *Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002).
9  To sustain a claim for excessive force, the prisoner must establish three elements: (1) a prison
10 official used excessive and unnecessary force under all the circumstances; (2) that prison
11 official acted maliciously and sadistically for the purpose of causing harm; and (3) the prison
12 official's act caused harm to the prisoner. *Hudson v. McMillian*, 503 U.S. 1, 5–6 (1992). The
13 harm element may be satisfied by the pain of the malicious attack itself; the attack need not
14 result in permanent injury. *Schwenk v. Hartford*, 204 F.3d 1187, 1196 (9th Cir. 2000). The
15 question at this phase, then, is whether there exists any genuine dispute of material fact
16 relating to these elements.

17 The parties genuinely dispute several material facts. Howard describes a history of
18 verbal harassment and latent racial animus that led to a seemingly unprovoked pepper spray
19 attack. Nunley describes an inmate who behaved provocatively and who repeatedly
20 disobeyed orders, potentially creating a situation that would endanger the safety and security
21 of the prison. A reasonable jury could believe either story, but for purposes of this motion,
22 the Court must view the facts in the light most favorable to Howard, the non-moving party.
23 Thus, assuming that a jury believed Howard's side of the story, the Court must assess
24 whether it would amount to an Eighth Amendment excessive force violation.

25 The most important fact in this analysis is that Howard admits he received an order
26 not to knock on his cell door a second time, and that he disobeyed that order. "The use of
27 mace, tear gas or other chemical agent of the like nature when reasonably necessary to . . .
28 subdue recalcitrant prisoners does not constitute cruel and inhuman punishment." *Soto v.*

*Dickie*, 744 F.2d 1260, 1270 (7th Cir. 1984); *see also Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979) ("use of . . . tear gas . . . in small amounts may be a necessary prison technique if a prisoner refuses after adequate warning to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required").

Howard's disobedience qualified him as a "recalcitrant prisoner," but simply knocking on a cell door may not be the sort of recalcitrance for which pepper spray would be reasonably necessary to subdue. Nonetheless, under the Eight Amendment, Nunley's use of the pepper spray must have been more than "objectively unreasonable"; it must have been "malicious and sadistic." *Clement*, 298 F.3d at 903. In this regard, Howard has testified that: (1) Nunley had previously harassed him about his vegetarian diet, (2) Nunley referred to him as a "nigger" after discharging the pepper spray, and (3) Nunley discharged the entire pepper spray can into his cell for no other reason than to make sure that he "got" Howard.

The Court need not decide whether, on these alleged facts, Howard could prove a constitutional offense. Even if Nunley's behavior violated the Eighth Amendment, this Court finds that Nunley is entitled to qualified immunity because he violated no clearly established right. *See Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (a government official deserves qualified immunity if either (a) the facts show no constitutional violation, or (b) the right allegedly violated is not clearly established). A right is clearly established if

> a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citation omitted). "If the only reasonable conclusion from binding authority were that the disputed right existed, even if no case had specifically so declared, prison officials would be on notice of the right and would not be qualifiedly immune if they acted to offend it." *Blueford v. Prunty*, 108 F.3d 251, 255 (9th Cir. 1997).

Supreme Court and published Ninth Circuit precedent have little to say about the appropriate use of pepper spray or similar agents to enforce prison discipline. More than thirty years ago, the Ninth Circuit announced that tear gas may be appropriate to subdue prisoners behaving provocatively. *Spain*, 600 F.2d at 195. Eight years ago, the Ninth Circuit held that prisoners had stated no constitutional violation where prison officials had used pepper spray to break up a fight, including a second blast of spray after the prisoners had clearly begun choking and gagging on the first blast. *Clement*, 298 F.3d at 901–05. The Court has located no other relevant published authority.

Unpublished (and therefore nonbinding) Ninth Circuit decisions regarding pepper spray in prison point in various directions. In one case, for example, the prisoner alleged that he had "refused to turn over his food tray until prison officials would discuss the matter of concern with him." *Vlasich v. Reynoso*, 117 F. App'x 568, 569 (9th Cir. 2004). The prisoner then relented and put his food tray in the middle of his cell where officers could get it, but the prison officers nonetheless sprayed him six times with pepper spray. *Id.* The Ninth Circuit held (at the motion to dismiss phase) that the prisoners allegations supported "a reasonable inference of wanton infliction of pain in violation of the Eighth Amendment." *Id.*

But another unpublished decision goes much further toward permitting pepper spray in a broad range of potential disciplinary circumstances. Without giving details of the incident leading to use of pepper spray, the Ninth Circuit stated that prison "adminisrators' alleged policy of spraying prisoners with pepper spray for refusing to follow directions falls within the wide-ranging zone of deference accorded to prison officials in shaping 'prophylactic or preventive measures intended to reduce the incidence of . . . breaches of prison discipline.'" *Stewart v. Stewart*, 60 F. App'x 20, 22 (9th Cir. 2003) (quoting *Whitley v. Albers*, 475 U.S. 312, 322 (1986)). Indeed, "allegations that the administrators authorized corrections officers to dispense pepper spray across entire pod areas whenever an individual prisoner acts in a disruptive manner [likewise] fail[ed] to show that excessive force was used." *Id.*

Cases from other circuits similarly point in various directions regarding the permissible use of pepper spray. In the Eight Circuit, for instance, a prisoner claimed that he had been pepper sprayed after he had questioned an order, then complied, and then apparently showed disrespect when a prison guard asked him a question and the prisoner answered over his shoulder (*i.e.*, without turning around to face the guard). *Jones v. Shields*, 207 F.3d 491, 493 (8th Cir. 2000). Assuming that events had transpired as the prisoner alleged, the Eighth Circuit nonetheless saw no constitutional violation. Rather, the court effectively endorsed "limited application of [pepper spray] to control a recalcitrant inmate" as a "tempered response by prison officials when compared to other forms of force." *Id.* at 496 (footnote and internal quotation marks omitted); *see also Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996) ("because a limited use of mace constitutes a relatively 'mild' response compared to other forms of force, the initial application of mace indicates a 'tempered' response by the prison officials"); *Enriquez v. Kearney*, 694 F. Supp. 2d 1282, 1293–95 (S.D. Fla. 2010) (granting summary judgment to prison officials where they had used pepper spray on a recalcitrant but nonviolent inmate after about an hour of warnings).

Two years later, however, the Eighth Circuit expressed some hesitation with the scope of the *Jones* ruling because it seemed to suggest that "use of [pepper spray] on a disobedient or querulous inmate can never make out a constitutional violation." *Treats*, 308 F.3d at 872. "The law recognizes that order and discipline are important in running a correctional institution, but that does not . . . justify punitive use of force on difficult inmates not posing a real threat to other persons or raising security concerns." *Id.* Without overruling *Jones*, the court held that use of pepper spray without warning on a disobedient but otherwise nonthreatening inmate could violate the Eighth Amendment. *Id.* at 873; *see also Thompson v. Northern*, 574 F. Supp. 2d 1029, 1034 (E.D. Mo. 2008) (denying summary judgment where prison officials used "very high volumes of pepper spray," opining that "[t]his particular use of force may have been an excessive response to the situation").

Considering the equivocal nature of the cases, this Court cannot say that Howard had a clearly established right to be free from pepper spray in the circumstances he describes.

Even if Nunley held personal animus toward Howard, Nunley was entitled to believe that Howard's disobedience — which Howard admits — could threaten prison security. Nunley may have overreacted (under Howard's story), but no clearly established law forbade Nunley from using pepper spray in those circumstances. Nunley is therefore entitled to qualified immunity.

### B. Howard's Unconstitutional Conditions Claim Against Sullivan

Howard alleges that the "strip cell" inflicted cruel and unusual punishment, and he blames Sullivan. It is undisputed, however, that Howard did not exhaust administrative remedies within the prison system before bringing this claim. The Prison Litigation Reform Act therefore bars Howard's claim, *see* 42 U.S.C. § 1997(e), and Sullivan is entitled to summary judgment.

### C. Howard's "State Tort Claims"

Howard's complaint alleged a claim for relief under state tort law (Doc. 18 at 10). Howard has never explained the basis of this claim, nor how it differs from his constitutional arguments. The Court will therefore grant summary judgment to Defendants on this claim.

IT IS ORDERED that Defendants' Motion for Summary Judgment (Doc. 60) is granted.

IT IS FURTHER ORDERED that the Clerk enter judgment in favor of Defendants against Plaintiff, and that Plaintiff take nothing. The Clerk shall terminate this case.

DATED this 24th day of September, 2010.

_____
Neil V. Wake
United States District Judge

- 9 -